UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
SANYAL VALCOURT,                                    :
                                                    :
                              Plaintiff,            :        **OPINION & ORDER**
               -against-                            :
                                                    :        09-CV-4172 (DLI)
MICHAEL J. ASTRUE, Commissioner of Social           :
Security,                                           :
                                                    :
                              Defendant.            :
----------------------------------------------------------------x
**DORA L. IRIZARRY, United States District Judge:**

Plaintiff Sanyal Valcourt appeals a decision of the Commissioner of Social Security (the

"Commissioner") that she is not disabled under the Social Security Act (the "Act") and therefore

not entitled to disability benefits.  Pursuant to Fed. R. Civ. P. 12(c), the parties cross-moved for

judgment on the pleadings.  For the reasons set forth below: (1) Plaintiff's motion is granted and

the case is remanded to the Commissioner, pursuant to the fourth sentence of 42 U.S.C. § 405(g),

for further proceedings in which the ALJ is to properly weigh the opinions of Plaintiff's treating

physicians and consultative examiners, and further develop the record as needed; and (2) the

Commissioner's motion is denied.

## BACKGROUND

### I.    Procedural History

Plaintiff filed an application for Disability Insurance Benefits ("DIB") pursuant to 42

U.S.C. § 301 *et seq.*, on December 30, 2004, alleging a continuous disability due to herniated

discs in her cervical and lumbar spine with nerve root impingement, degenerative disc disease,

chronic bilateral shoulder pain and impingement, chronic arthritis in the knees and status-post

failed left hip surgeries. (Administrative Record "A.R." 83B.)  The application was denied upon

initial review, and on May 16, 2005, Plaintiff filed a request for an administrative hearing. (*Id.* at 66.)  On March 28, 2007, Administrative Law Judge ("ALJ") Strauss dismissed the request as untimely. (*Id.* at 57–62).  The Appeals Council vacated the ALJ's dismissal and remanded the case for an administrative hearing. (*Id.* at 68–74.)  On April 24, 2008, Plaintiff appeared and testified before ALJ Strauss. (*Id.* at 289–360.)  Following the hearing, Plaintiff's counsel submitted additional medical evidence. (*Id.* at 45.)

In a decision dated March 20, 2009, ALJ Strauss found plaintiff not disabled, and, therefore, not entitled to DIB, because she retained the capacity to perform a wide range of light and sedentary work. (A.R. 14.)  Plaintiff appealed the decision. (*Id.* at 24–44.)  On July 24, 2009, the Appeals Council denied Plaintiff's request for review, and the ALJ's decision became the Commissioner's final decision. (*Id.* at 4–6.)  Plaintiff timely filed the instant action on September 28, 2009. (*See generally* Compl. ¶¶ 1–15.)

## II.    Testimonial and Non-Medical Evidence

Plaintiff was born on April 28, 1964 in New York, and she has a college degree. (A.R. 293, 295.)  She worked as a mail handler for the United States Postal Service ("U.S.P.S.") from February 1990 until her alleged disability onset in December 2002. (*Id.* at 301.)  From 1990 to 1997, Plaintiff worked on regular duty for U.S.P.S., frequently walking, standing, lifting 10 to 25 pounds and pushing heavy carts of mail. (*Id.* at 95, 105, 112, 123.)  Following a work injury and three-month medical leave in 1997, Plaintiff was assigned to light duty, where she repaired damaged mail, sorted mail in trays, lifted up to 30 pounds, and was occasionally required to push up to 145 pounds. (*Id.* at 304–09).  She stopped working in December 2002 following a workplace accident that pinned her between two postal containers, thus injuring her back, neck and shoulders, as well as her hands. (*Id.* at 296–301.)  Following the accident in 2002, Plaintiff

received Worker's Compensation benefits in the amount of $2,200 per month, and subsequently received $1,266 per month in federal disability benefits through the United States Office of Personnel Management, due to cervical and lumbar radiculopathy, bilateral shoulder derangement, bilateral carpal tunnel syndrome and bilateral knee derangement. (*Id.* at 297–98.) She was receiving federal disability benefits at the time of the hearing.

Since her injury in 2002, Plaintiff has suffered from joint pain in her neck, back, shoulders, hands, knees, hips, ankles and elbows. Her neck and shoulders "locked up" and her range of motion was limited. (A.R. 315–17.) She experienced spasms in her neck and back, resulting in an inability to move, and alternating dull and stabbing pain in her lower back, which was exacerbated by changing positions and standing up. (*Id.* at 317.) According to Plaintiff, sometimes the pain was "so bad" when moving positions that she couldn't do anything but "stand and hold on and wait until it passe[d]." (*Id.* at 317.) She also suffered from occasional urinary incontinence, because of an inability to move quickly enough to get to the bathroom. (*Id.*) She testified that getting out of bed in the morning, washing up, and performing repetitive motions, like writing, caused her shoulders and elbows to "lock up," where her muscles hardened and she felt electrical shocks of pain. (*Id.* at 318.) Her hands also "locked up," she experienced swelling in her knees, and swelling, pain and inflammation in her hips due to arthritis. Plaintiff reported that she could stand anywhere from 3 to 25 minutes at a time, sit for up to 25 minutes at a time, and walk up to one block "on a good day," but was in constant pain whether sitting or standing. (*Id.* at 340.) She had difficulty sleeping due to her pain, testified that she woke up every two hours, and was unable to sleep for more than five hours during the night. (A.R. 347–48.) Plaintiff testified that she takes muscle relaxers and NSAIDs for pain. At the time of the hearing, she was prescribed Vicodin, Valium, Ibuprofen and Diazepam. (*Id.* at 321.) She

reported some relief from pain with muscle relaxers, and, therefore, had to "stay on medication," taking it every day, to control spasms. (*Id.* at 321.) She experienced significant drowsiness from her medications.

Plaintiff resided in Jamaica, New York with her husband and two children, ages six and nine, at the time of the administrative hearing. (*Id.* at 293–94.) She testified that she lived in a three-family home with her mother and that her sister lived "around the corner." (*Id.* at 329.) Plaintiff's mother and sister helped out significantly with child-care duties. (*Id.* at 326.) Her husband worked a night shift and took the children to school in the mornings. Plaintiff's husband also did the household laundry and dishes, although Plaintiff warmed up meals in the microwave when he was not home and "wash[ed] a mug" on occasion. Plaintiff visited with her mother and sister, was driven to church by her husband two or three times per month, tried to visit her aunt every two months, and spoke to other friends and relatives on the telephone. (*Id.* at 329–30.) She did not take public transportation. (*Id.* at 332.) She occasionally used a non-prescribed cane, and wore wrist splints. (*Id.* at 333.) Plaintiff reported that she fed and dressed herself, "washed up" in the sink and required assistance to shower and wash her hair. (*Id.* at 337.) She testified that she could lift, and sometimes carry, approximately five pounds, but not ten. (*Id.* at 339.)

## III.  Medical Evidence

At the hearing, Plaintiff introduced medical evidence of her impairments. (A.R. 291–92.) Her attorney submitted additional documentation following the hearing.

### A.  Treating Physicians

#### 1)  Dr. Lambrakis

Plaintiff received treatment from Dr. Emmanuel Lambrakis from 2001, preceding her second work-related injury, through 2008.[1] (A.R. 194–99, 234–37.) The record reflects that Dr. Lambrakis, an internist and general surgeon, examined Plaintiff on at least six occasions, and diagnosed her with severe cervical and lumbar radiculopathy,[2] bilateral shoulder derangement, bilateral carpal tunnel syndrome and bilateral knee derangement. (*Id.*)  Plaintiff stated that she met with Dr. Lambrakis every 30 or 45 days beginning in 2004, and also attended physical therapy sessions with him in 2006.[3] (*Id.* at 330.)  In examining Plaintiff, he reviewed various diagnostic reports discussed *infra*, including Magnetic Resonance Imaging ("MRI") tests of the cervical and lumbar spines and both shoulders, (*id.* at 213–16), Electromyograms ("EMGs") of Plaintiff's hands and cervical spine, (*id.* at 205–07), and a lumbar spine computed tomography myelogram ("myelogram"). (A.R. 208–12.)   In examining Plaintiff, Dr. Lambrakis observed limited mobility of the cervical spine, muscle spasm in the neck and back, decreased range of

_____

[1] Prior to her second injury and alleged disability onset date of December 14, 2002, Dr. Lambrakis recommended that Plaintiff return to work on light duty. (A.R. 198.)

[2] Radiculopathy is a disease of the nerve roots, here affecting the neck and the sides of the back between the thorax and pelvis. *See* Dorland's Illustrated Medical Dictionary 1511 (29th ed. 2000).

[3] Plaintiff discontinued physical therapy after her insurance carrier declined to reimburse additional sessions, noting that Plaintiff's condition was not improving with treatment. (A.R. 282.)

motion in both shoulders, bilateral positive straight leg raising and joint effusion in both knees. (*Id.* at 195.)

On March 27, 2008, Dr. Lambrakis also completed a Functional Assessment form in which he opined that Plaintiff was limited to less than two hours of standing and six hours of sitting per day, and could lift between five and ten pounds frequently and/or occasionally. (*Id.* at 236.) He noted that, due to her symptoms and medications' side effects, Plaintiff could not work eight hours in a day. She suffered from pain, needed bed rest during the day, had difficulty concentrating on tasks, and needed more than two sick days per month. (*Id.* at 236–37.) Dr. Lambrakis also noted that Plaintiff was "disabled for employment." (*Id.*) Dr. Lambrakis's examination of Plaintiff on March 27, 2008 is the most recent medical examination in the record. (*Id.* at 234–35.)

2) Dr. Miller

Dr. Paul Miller, an orthopedic surgeon, treated Plaintiff from August 2001 to March 2006. (A.R. 163–79, 200.) The record contains only limited notes regarding Dr. Miller's treatment. (*Id.* at 163–79.) Dr. Miller examined Plaintiff on two occasions preceding her alleged disability onset date, and subsequently in September and November of 2004 and in March 2006. (*Id.* at 163–79, 200.) In September 2004, Dr. Miller noted that cervical spine forward flexion was nearly complete, and Plaintiff had difficulty changing positions. Sensory and other reflexes were unremarkable, and examination of the lower back revealed limited forward flexion, limited extension and intact rotation. In November 2004, Dr. Miller noted pain on flexion of cervical spine, a limited range of extension with pain, limited forward flexion of lower back and limited bilateral straight leg raising. In March 2006, Dr. Miller relayed x-ray results, noting negative

knee and ankle x-rays and spurring at the neck of the femoral head in the left hip resulting in "status post slipped epiphysis." (*Id.* at 200).

### 3) Dr. Ki-Ho Moon

Dr. Moon, an orthopedic surgeon, examined Plaintiff on January 28, 2003. (A.R. 238–40.) She reviewed the MRIs of Plaintiff's shoulders, lumbar and cervical spine, discussed *infra*, and conducted a physical examination. (*Id.*) On examination, Dr. Moon observed a full range of motion in the neck and lower back with no tenderness present, a normal gait and tiptoe/heel walking, negative straight leg raising and mild tenderness at the deltoid insertions of both shoulders. (*Id.* at 239.) Dr. Moon diagnosed Plaintiff with cervical spine radiculopathy, traumatic arthropathy of both shoulders and low back derangement. (*Id.*)

### 4) Abraham Lock

Abraham Lock treated Plaintiff from December 2002 through March 2003. (A.R. 218–33.) Lock surrendered his medical license on February 3, 2006.[4] In his December 17, 2002 examination, Lock observed tenderness in the cervical and lumbar spine with muscle spasm, decreased range of motion in the neck, limited flexion of the back, positive Patrick test (left more than right), and positive Spurling test on the left side with pain radiating down the spine, and positive L'Hermite test. (*Id.* at 231–32.) Subsequent examinations on December 27, 2002 and January 22, 2003 produced similar observations, and Lock noted no improvement in Plaintiff's

---

[4] Abraham Lock surrendered his medical license based upon a failure to defend against charges of misconduct, including failing to perform and conduct an adequate physical examination and improperly interpreting diagnostic tests. *See New York State Board of Professional Medical Conduct*, Order No. BPMC 06-24 (Feb. 23, 2006). The ALJ considered this when deciding to set aside Lock's opinion. (A.R. 17.) Because the information was publicly available at the time of the hearing, contrary to Plaintiff's assertion, the ALJ did not deny Plaintiff her right to due process. (*See* Pl.'s Mot. J. Plead. 20–21.) Furthermore, Plaintiff will have the opportunity to address the reliability of Lock's opinion on remand.

condition. (*Id.* at 224–30.)  On March 13, 2003, Lock followed up with Plaintiff and reviewed the MRIs of her cervical and lumbar spine, and left and right shoulders, diagnosing her with cervical and lumbar spine radiculopathy and bilateral shoulder sprain. (*Id.* at 226.)  Lock recommended physical therapy, a neurological consultation, and an EMG of the upper and lower extremities. (*Id.*)

    5)  Dr. Casson

    Dr. Ira Casson, a neurologist, examined Plaintiff on July 30, 2004 and February 3, 2006. Dr. Casson's evaluations reference additional examinations not contained in the record. (A.R. 249-52.)  On June 30, 2004, Dr. Casson observed spasm in Plaintiff's neck and back, limited gait, and negative Tinel and Babinski signs with normal sensory and motor skills. (*Id.* at 251.) Dr. Casson reviewed EMG-NCV tests which indicated moderate bilateral carpal tunnel syndrome, causing numbness, tingling and discomfort in Plaintiff's hands. In addition to his finding of bilateral carpal tunnel syndrome, Dr. Casson diagnosed Plaintiff with chronic lumbar radiculopathy with bulging and/or herniated discs, cervical sprain, and bilateral problems in shoulders resulting in chronic pain. (*Id.* at 251.)  In February 2006, Dr. Casson examined Plaintiff and observed positive bilateral straight-leg raising, marked spasm of the neck and lower back, limited gait, and decreased pin sensation in the lower back and upper extremities. (*Id.* at 249.)  He again diagnosed Plaintiff with bilateral carpal tunnel syndrome and permanent bilateral lumbar radiculopathies, remarking that Plaintiff's condition would not improve over time, and that she remained disabled and unable to return to work. (*Id.* at 250.)

### B. Consultative Examiners

#### 1) Dr. Buschmann

Dr. William Buschmann, an orthopedic surgeon, examined Plaintiff on July 21, 2003 in connection with her federal worker's compensation claim. (A.R. 241–43.)   Dr. Buschmann observed some spinal tenderness and mid-line bony tenderness in both the cervical and lumbar spine, a normal gait, but no muscle spasms and no sensory or motor deficits. (*Id.* at 241–42.)  Dr. Buschmann noted that Plaintiff had negative straight-leg raising, and negative Tinel's and Phalen's signs bilaterally.  Plaintiff's shoulders, hips and knees had no swelling or atrophy in the muscles, and she exhibited normal reflexes. (*Id.*)  The record does not contain Dr. Buschmann's diagnosis, but includes a check-off form in which he opined that Plaintiff was unable to return to her previous work, but was otherwise capable of working eight hours per day with restrictions. (*Id.* at 243.)  According to Dr. Buschmann, Plaintiff was limited to less than two hours per day of reaching, twisting, and bending/stooping, squatting, kneeling and climbing, and should not lift, push or pull more than 20 pounds. (*Id.*)

#### 2) Dr. Aldea

Dr. Dyana Aldea, a specialist in rehabilitation medicine, examined Plaintiff on April 8, 2005 in connection with her application for DIB. (A.R. 182–86.)  Dr. Aldea noted that Plaintiff had full flexion and range of movement in the cervical spine with no spasm, limited flexion and extension in the lumbar and thoracic spine, mild paraspinal tenderness and mild joint pain bilaterally, but no spasm, scoliosis or kyphosis. (*Id.* at 184.)  Strength and range of movement in Plaintiff's hands, knees and ankles were all within normal limits, although strength in the hips was 4/5 bilaterally.  Plaintiff had difficulty walking on heels and toes, and squatting. (*Id.*)  Dr. Aldea noted that x-rays were taken of Plaintiff's left hip and cervical and lumbar sacral spine.

The x-rays revealed markedly narrowed L5-S1 disc space, "lipping"[5] of the cervical discs, straightening of the lordotic curve and traces of surgical pins in the left hip. (*Id.* at 186.) Dr. Aldea diagnosed Plaintiff with "low back pain, bilateral hip pain, bilateral shoulder pain, arthritis, headache, hypertension" and "heart murmur." (*Id.* at 185.) She opined that Plaintiff had no walking or standing limitations, and that her ability to bend, climb, squat and lift was mildly limited. She also found Plaintiff mildly limited in performing fine motor activity of the upper extremities. (*Id.*)

3) Dr. Diamond

Dr. Burton S. Diamond, a neurologist, examined Plaintiff in connection with her worker's compensation claim on July 22, 2003. (A.R. 244–48.) He observed decreased range of motion in Plaintiff's neck and back, negative straight leg raising, normal strength in the arms and legs, and no evidence of spasm. Sensory examination was "basically intact." (*Id.* at 246.) Dr. Diamond found evidence of cervical and lumbar sprain, decrease in range of motion and subjective tenderness, but no neurological deficits. He concluded that he "d[id] not have strong evidence of radiculopathy" and that "apparently, the MRIs showed no nerve root compression." (*Id.*) Dr. Diamond also remarked that he did not know the results of Plaintiff's myelogram and post-myelogram CT scan. He indicated Plaintiff was limited to four hours per day of walking and standing, two hours of pushing, pulling and lifting (with a maximum weight of 20 pounds), and two hours of squatting, kneeling and climbing. (*Id.* at 248.) Dr. Diamond did not find restrictions on Plaintiff's repetitive use of wrists and elbows, and determined that she could sit continuously throughout the day.

---

[5] "Lipping" is the development of a bony overgrowth in osteoarthritis. *See* DORLAND'S, *supra* note 2, at 1018.

### C. Laboratory and Diagnostic Tests

1) January 3, 2003 MRIs of the Cervical and Lumbar Spine

An MRI of the cervical spine conducted on January 3, 2003 revealed straightening of the normal lordotic curve consistent with muscle strain or spasm and C1–C2 annular disc bulge. (A.R. 216.)  An MRI of the lumbar spine conducted that day also revealed straightening of the normal lordotic curvature of the lumbar spine due to muscle strain or spasm, degenerative disc narrowing at the L5–S1 intravertebral space and posterior disc bulges at the L4–5 and L5–S1 levels.  (*Id.* at 215.)

2) January 7, 2003 MRI of the Left and Right Shoulders

An MRI of the right shoulder conducted on January 7, 2003 revealed subacromial spurring impinging upon the supraspinatus muscle tendon complex, increased signal intensity in the supraspinatus tendon compatible with tendinosis or intrasubstance degeneration, and no evidence of fracture or biceps disclocation. (*Id.* at 213.)  An MRI of the left shoulder similarly revealed subacromial spurring impinging upon the supraspinatus muscle tendon complex, findings compatible with mild bursitis, and no evidence of fracture or rotator cuff tendon tear. (*Id.* at 214.)

3) June 26, 2003 Myelogram

A myelogram and CT scan on June 26, 2003 revealed a small to moderate right paracentral disc herniation at the L4–L5 level and degenerative disc disease with moderate posterior and large bilateral far lateral disc bulges (with accompanying posterolateral ostephytes). (*Id.* at 212.)  The appearance of the disc bulges indicated probable nerve root impingement. (*Id.*)

4) December 31, 2003 EMG

An EMG on December 31, 2003 revealed evidence of bilateral moderate acute cervical radiculopathy on the right and left sides, and bilateral moderate acute lumbar radiculopathy. (A.R. 207.)

5) April 8, 2005 X-Rays by Consultative Examiner

X-Rays were taken of Plaintiff's left hip and cervical and lumbar sacral spine on April 8, 2005. (*Id.* at 186.)  The x-rays revealed markedly narrowed L5–S1 disc space, "lipping" of the cervical discs, straightening of the lordotic curve and traces of surgical pins in the left hip. (*Id.*)

## STANDARDS

### I.      General Legal Standards

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their  benefits "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow." 42 U.S.C. § 1383(c)(3).  A district court, reviewing the final determination of the Commissioner, must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *See Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998).

ALJs must apply a five-step inquiry to determine whether a claimant is disabled under the Act as set forth in 20 C.F.R. § 404.1520.  If at any step the ALJ finds that the claimant is either disabled or not disabled, the inquiry ends.  First, the claimant will be found not disabled if he or she is engaged in work qualifying as "substantial gainful activity" ("SGA"). 20 C.F.R. § 404.1520(b).  Second, the ALJ must consider whether the Plaintiff has a "severe impairment" without considering age, education or work experience.  Impairments deemed "severe"

significantly limit the claimant's physical or mental "ability to conduct basic work activities." 20 C.F.R. § 404.1520(c). Third, the ALJ will find a claimant disabled if his or her impairment meets or equals an impairment listed in Appendix 1. *See* 20 C.F.R. § 404.1520(d).

If the claimant does not have a listed impairment, the ALJ proceeds to steps four and five. In these steps, the ALJ determines the claimant's "residual functional capacity" ("RFC"), or ability to perform work activities despite physical and mental limitations. 20 C.F.R. § 404.1520(e). In the fourth step, the claimant is not disabled if he or she is able to perform "past relevant work" either as actually performed or as performed in the national economy. 20 C.F.R. § 404.1520(f). At step five, the ALJ ascertains whether the claimant can perform any other work existing in the national economy, considering factors such as age, education and work experience. To support a finding that a claimant is not disabled at step five, the burden is on the Commissioner to demonstrate that Plaintiff can perform other jobs that exist in significant numbers in the national economy. 20 C.F.R. § 404.1560(c); *see also Schaal*, 134 F.3d at 501. If so, the claimant is not disabled. 20 C.F.R. § 404.1520(g).

## II.     Treating Physician Rule

The ALJ must consider all medical opinions received regarding the claimant. 20 C.F.R. § 404.1527(d). The rule "mandates that the medical opinion of the claimant's treating physician [be] given controlling weight if it is well supported by the medical findings and is not inconsistent with other substantial record evidence." *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000). Controlling weight need not be given to a treating physician's opinion if that opinion is inconsistent with those of "other medical experts." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam); *see also Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999). Similarly, controlling weight need not be given to the treating physician's opinion if it is inconsistent with

the plaintiff's own testimony. *See Navan v. Astrue*, 303 F.App'x 18, 20 (2d Cir. 2008). If the treating physician's opinion is not controlling, "it is still entitled to significant weight because the treating source is inherently more familiar with a [plaintiff]'s medical condition than are other sources." *See Snell*, 177 F.3d at 133.

If an ALJ does not give controlling weight to a treating source, the ALJ must determine what weight to give the treating physician's opinion, and give "good reasons" for the weight given. 20 C.F.R. § 404.1527(d)(2). Courts must remand when they "encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." *Halloran*, 362 F.3d at 32. The factors that an ALJ must consider when assigning weight to the treating physician's opinion are: (1) the length and extent of the treatment relationship; (2) whether evidence such as laboratory findings supports the source's opinion; (3) whether the treating source is a specialist; (4) the consistency of the opinion with the rest of the record; and (5) "any factors [plaintiff] or others bring to [the ALJ's] attention, or of which they are aware, which tend to support or contradict the opinion." 20 C.F.R. § 404.1527(d)(2)–(6); *see also Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998).

## DISCUSSION

As set forth below, this matter must be remanded because the ALJ erred in weighing the medical evidence of Plaintiff's treating physicians and consultative examiners, and failed to adequately develop the record. Accordingly, the court need not consider Plaintiff's assertion that the ALJ's "light" RFC finding is not supported by the evidence.

### I. The ALJ Misapplied the Treating Physician Rule by Disregarding the Findings and Opinions of Drs. Lambrakis and Casson.

The ALJ afforded Dr. Lambrakis's opinions "less weight," and based her decision on the assessments of consultative examiners (Drs. Aldea, Buschmann, Diamond and Toledano). (AR 20.) In setting aside Dr. Lambrakis's diagnoses and recommendations, the ALJ asserted that his treatment of the Plaintiff was "sporadic," his opinion was "not supported with clinical diagnostic testing showing any marked findings," and his credential was not "as specialist as the other orthopedists and neurologists who contributed to this record." (*Id.* at 19.)

Plaintiff's testimony, however, evinced an ongoing physician-patient relationship over the course of seven years. (*Id.* at 331–33.) She testified that she began treatment with Dr. Lambrakis in 2001, before her alleged disability onset date. She also testified that she met with Dr. Lambrakis "every 30 or 45 days" beginning in 2004, and in 2006, three times per week for physical therapy. (*Id.*) In March 2008, immediately preceding the hearing, Plaintiff again met with him. (*Id.*) The record contains six reports from Dr. Lambrakis (dated May 14, 2002, September 18, 2004, November 13, 2004, September 21, 2006, November 7, 2006, and March 27, 2008) and findings from his physical examinations of Plaintiff. (A.R. 194–99, 234–37.) The fact that the administrative record contains gaps in treatment does not itself negate a treating physician's opinion, provided it is otherwise supported. *See Shaw*, 221 F.3d. at 126 (plaintiff's

failure to meet with treating physician for a period of over three years did not negate treating physician's view, which was otherwise supported by findings and not inconsistent with other substantial record evidence).

Additionally, before making an adverse determination based upon gaps in the treatment record, the ALJ should affirmatively make all reasonable efforts to supplement the record. *See Schaal,* 134 F.3d at 505 ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] *sua sponte.*"); *see also Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (discussing ALJ's affirmative duty to develop the record, seek additional evidence, and seek to resolve any inconsistencies in the treatment record, even when plaintiff is represented by counsel). Although the ALJ subpoenaed additional medical records from Dr. Lambrakis, she did not discuss why she failed to enforce the subpoena or attempt to fill "gaps in the treatment record" by re-contacting him. *See Treadwell v. Schweiker,* 698 F.2d 137, 142 (2d Cir. 1983) (remanding due to ALJ's failure to state reasons for not enforcing a subpoena for medical records before making adverse determination); *see also* 20 C.F.R. § 404.1525(e) (setting forth procedure for ALJ to re-contact a physician if the evidence received contains conflicts or ambiguities); *Schaal,* 134 F.3d at 505 (duty to develop the record).

Moreover, Dr. Lambrakis's diagnoses and opinions are supported by both clinical diagnostic testing and the opinions of specialists. His diagnosis of cervical and lumbar radiculopathy is based on both an EMG dated December 31, 2003, which revealed moderate acute cervical radiculopathy on the right and left sides and bilateral moderate acute lumbar radiculopathy, and a June 26, 2003 myelogram, which revealed paracentral disc herniation, degenerative disc disease and probable nerve root impingement at the L4–L5 level. (A.R. 207, 212.) Furthermore, two board-certified specialists concurred in the diagnosis: Dr. Moon, an

16

orthopedic surgeon (*Id.* at 238–39), and Dr. Casson, a neurologist (*Id.* at 226.)  Dr. Lambrakis's diagnosis of bilateral shoulder derangement is reflected in MRIs of the right and left shoulders dated January 7, 2003, which supported tendinosis or instrasubstance degeneration in the right shoulder and mild bursitis in the left shoulder.  (A.R. 213.)  Dr. Moon similarly diagnosed Plaintiff with traumatic arthropathy of both shoulders. (*Id.* at 239.)  Dr. Lambrakis also concluded that Plaintiff suffered from low back derangement after reviewing MRIs of her lumbar spine, which revealed degenerative disc narrowing, multiple posterior disc bulges and straightening of the normal lordotic curve due to muscle strain or spasm. (*Id.* at 215.)  His diagnosis was echoed by Dr. Moon. (*Id.* at 239.)  In his evaluation of Plaintiff's condition, Dr. Lambrakis specifically references various clinical tests as support for his findings. (*Id.* at 194–95, 234–35.)  In concluding that Dr. Lambrakis's opinion was entitled to less weight because it was not supported by clinical diagnostic testing, the ALJ erred in failing to reference the MRI, EMG and Myelogram tests that support this treating physician's diagnosis.  *See Fernandez v. Apfel,* 2000 WL 271967, at *7 (E.D.N.Y Mar. 7, 2000) (finding that ALJ misapplied the treating physician rule in failing to discuss MRI and EMG tests supporting the physician's diagnosis).

The ALJ also cites Dr. Lambrakis's designation as a generalist as grounds for affording his opinion "less weight."  Courts have found, however, that a treating physician's opinion may be given controlling weight—even if that physician is not a specialist—if the remaining factors in the analysis are satisfied.  *See Ilarda v. Chater,* 1996 WL 389366, at *11 (E.D.N.Y. July 8, 1996) (ALJ erred in assigning lesser weight to non-specialist treating physician's opinion when the opinion was supported by other evidence in the record and by specialists' opinions).  In the instant case, both a board-certified neurologist and orthopedic surgeon concurred with some of Dr. Lambrakis's diagnoses.

In sum, it was legal error for the ALJ to set aside Dr. Lambrakis's diagnosis and vocational assessment without adequately discussing the clinical diagnostic tests, physical examinations of Plaintiff, and conclusions of board-certified specialists that supported the doctor's opinion. In addition, any "gaps in the treatment record" should not form the basis of an adverse determination, but rather prompt the ALJ to affirmatively attempt to fill those gaps. *Rosa*, 168 F.3d at 79; *Schaal,* 134 F.3d at 505.

Furthermore, the ALJ incorrectly set aside the opinion of Dr. Casson, citing a lack of clinical and diagnostic testing or treatment notes supporting his diagnoses of bilateral lumbar radiculopathy and carpal tunnel syndrome. (A.R. 20.) Dr. Casson, a specialist, references "EMG-NCV" studies revealing evidence of bilateral carpal tunnel syndrome. (*Id.* at 249–52.) It is unclear whether Dr. Casson refers to the EMG testing contained in the administrative record, or additional testing not included therein. (*Id.* at 208–11.) In any event, his diagnosis of bilateral lumbar radiculopathy appears to be supported by an EMG dated December 31, 2003 that is contained in the record. (*Id.* at 207.) The ALJ did not make any attempt to ascertain which EMG report the doctor was referring to before determining that the diagnosis "is not supported by independent testing such as electromyography studies," and that the EMG tests in the file "do not indicate carpal tunnel syndrome."[6] (*Id.* at 20.) The ALJ's failure to clarify inconsistencies in the administrative record before making an adverse determination is inconsistent with her affirmative duty to fill gaps in the record. *See Rosa*, 168 F.3d at 79; *Schaal,* 134 F.3d at 505.

------

[6] If further evidentiary proceedings reveal that Dr. Casson's diagnosis of carpal tunnel syndrome is based on the EMG included in the record (A.R. 208–11), the ALJ cannot reject his opinion and conclude, as she has, that the EMGs "do[] not indicate carpal tunnel syndrome" based upon her own lay interpretation of the tests. *See Meadors v. Astrue*, 370 Fed.Appx. 179, 183 (2d Cir. 2010).

**II. The ALJ Incorrectly Assigned Controlling Weight to the Opinions of Consultative Drs. Aldea, Buschsmann, Diamond and Toledano**.

Notably, the ALJ asserted that these physicians "were provided with the entirety of the treatment record," and that the information provided to them was more comprehensive than that available to the treating physicians. (A.R. 19.)  The record contains no evidence, however, that the consultative examiners reviewed "more detailed and comprehensive information than was available to [Plaintiff's] treating source," as the ALJ alleges. (*Id.*)  To the contrary, Dr. Aldea's report noted x-rays of Plaintiff's cervical and lumbar spine and left hip taken concurrently with her examination, but did not address Plaintiff's extensive tests preceding the examination. (*Id.* at 185.)  Dr. Diamond noted in his evaluation that he did not review Plaintiff's June 26, 2003 myelogram, an essential clinical test suggesting nerve root impingement. (*Id.* at 246.); *see Burgess v. Astrue*, 537 F.3d 117, 130–31 (2d Cir. 2008) (concluding that consultative examiner's opinion was flawed because he did not review a key piece of evidence in the record; namely, an MRI of the lumbar spine)  Dr. Buschmann's report contains no discussion of Plaintiff's diagnostic tests.  (A.R. 241–43.)  Accordingly, the ALJ's assertion that the records reviewed and considered by these consultants were more comprehensive than those of Plaintiff's treating physicians is not supported in the record.  (*Id.* at 185, 241–43, 246.)

The ALJ also failed to address the significant lapse in time between the consultants' examinations of Plaintiff and the date of the hearing.  Drs. Buschmann and Diamond evaluated Plaintiff five years prior to the hearing, and Dr. Aldea's evaluation occurred three years before the hearing. (A.R. 182–86, 241–48.)  In contrast, Dr. Lambrakis last examined Plaintiff only one month before the hearing. (*Id.* at 234–35.)  Plaintiff allegedly suffers from conditions that are degenerative in nature—for example, degenerative disc disease of the cervical and lumbar

spine—and the ALJ did not explore whether Plaintiff's condition may have deteriorated in the years between the consultants' examinations and the hearing. *See Balodis v. Leavitt*, 704 F.Supp.2d 255, 266–67 (E.D.N.Y. 2010) ("When there is such a lengthy time period between opinions, the ALJ must explain [her] decision to choose the earlier opinion over the more recent opinion when the deterioration of a claimant's condition is possible."); *see also Ligon v. Astrue*, 2008 WL 5378374, at *10 (E.D.N.Y. Dec. 23, 2008) ("to give [statements of physicians who had treated Plaintiff more than 20 months prior to the hearing] greater weight than a treating physician's more recent findings without additional explanation amounts to legal error.") Therefore, the ALJ erred in both failing to address the lapse in time between the consultants' examinations and the degenerative nature of Plaintiff's condition. *See Balodis*, 704 F.Supp.2d at 266–67; *Ligon*, 2008 WL 5378374, at *10.

The ALJ also cited the opinion of Dr. Jacob Toledano in support of her determination that Plaintiff is not disabled, yet there are no actual medical documents from Dr. Toledano's examination in the record. (A.R. 19.) The record does, however, contain a U.S. Department of Labor worker's compensation report from May 2004 that references a physical examination of Plaintiff by Dr. Toledano. (*Id.* at 275.) The Commissioner concedes that information contained within the worker's compensation report regarding Dr. Toledano's examination may not itself constitute medical evidence, but asserts that it may be considered as "other evidence" pursuant to 20 C.F.R. § 404.1545(a). (Def.'s Rep. Mot. J. Plead. 4.) The ALJ, however, considered Dr. Toledano's findings as medical evidence, asserting that his opinion was entitled to greater weight than those of Plaintiff's treating physicians. (A.R. 19.) Notably, the ALJ did not evaluate or include in her decision the opinions of Drs. Abraham or Hollis, which are also transcribed and summarized in the same worker's compensation report, and appear to support the opinions of

Plaintiff's treating physicians. (*Id.* at 272–75.)  Even if the ALJ uses the 2004 worker's compensation report as "other evidence," she must consider all of the evidence in the report.  *See Cruz v. Barnhart*, 343 F.Supp.2d 218, 224 (S.D.N.Y. 2004) (The ALJ cannot "pick and choose evidence in the record that supports [her] conclusions.")

## **CONCLUSION**

For the reasons set forth above: (1) Plaintiff's motion is granted and the case is remanded to the Commissioner, pursuant to the fourth sentence of 42 U.S.C. § 405(g), for further proceedings in which the ALJ is to properly weigh the opinions of Plaintiff's treating physicians and consultative examiners, and further develop the record as needed; and (2) the Commissioner's motion is denied.   Lastly, counsel for Plaintiff may, within thirty days of this Order, submit to the court an application for fees and other expenses. *See id.* § 2412(d).

SO ORDERED

DATED:      Brooklyn, New York
            March 31, 2011

                                          /s/
                                  DORA L. IRIZARRY
                                United States District Judge